UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EARL ANTHONY JOHNSON,

       Petitioner,

       v.

BARRY D. DAVIS,

       Respondent.

_____/

CASE NO. 06-15760
JUDGE NANCY G. EDMUNDS
MAGISTRATE JUDGE PAUL J.  KOMIVES

## <u>REPORT AND RECOMMENDATION</u>

I.    <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.

II.    <u>REPORT</u>:

A.    *Procedural History*

    1.    Petitioner Earl Anthony Johnson is a state prisoner, currently confined at the Newberry Correctional Facility in Newberry, Michigan.

    2.    On November 6, 2003, following a jury trial, petitioner was convicted of three counts of armed robbery, MICH. COMP. LAWS § 750.529; three counts of kidnapping, MICH. COMP. LAWS § 750.349; one count of assault with intent to do great bodily harm less than murder, MICH. COMP. LAWS § 750.84; two counts of assault with a dangerous weapon, MICH. COMP. LAWS § 750.82; and one count of felony firearm, MICH. COMP. LAWS § 750.227(b).  Petitioner was sentenced to concurrent sentences of 126 months to 30 years' imprisonment on the first two counts of his armed robbery conviction; 180 months to 30 years' imprisonment on the third count of his armed-

robbery conviction; 126 months' to 30 years' imprisonment on the first two counts of his kidnapping conviction; 3-10 years' imprisonment on the assault with intent to do great bodily harm less than murder, and 2-4 years' imprisonment on both counts of the assault with a dangerous weapon conviction.   Additionally, petitioner was given a consecutive two years' imprisonment on the felony firearm conviction.

3.   Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.     THERE WAS INSUFFICIENT EVIDENCE AS A MATTER OF LAW TO ESTABLISH APPELLANT EARL ANTHONY JOHNSON'S CONVICTION FOR KIDNAPPING AS REQUIRED BY THE DUE PROCESS CLAUSES IN THE FEDERAL AND STATE CONSTITUTIONS.

II.    THE PROSECUTOR'S MISCONDUCT VIOLATED APPELLANT EARL ANTHONY JOHNSON'S RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL AS GUARANTEED BY BOTH THE FEDERAL AND STATE CONSTITUTIONS.

III.   APPELLANT EARL ANTHONY JOHNSON'S RIGHT TO EQUAL PROTECTION OF THE LAW AND HIS RIGHT TO A FAIR JURY WERE VIOLATED WHERE THE PROSECUTOR PURPOSELY EXCLUDED AFRICAN-AMERICANS FROM THE JURY.

IV.    APPELLANT EARL ANTHONY JOHNSON IS ENTITLED TO RESENTENCING WHERE THE STATUTORY SENTENCING GUIDELINES WERE MISSCORED AND THE IMPOSED SENTENCE IS A DEPARTURE FROM THE STATUTORY SENTENCING GUIDELINES ABSENT COMPLIANCE WITH THE DEPARTURE REQUIREMENTS AND IN VIOLATION OF DUE PROCESS OF LAW WHERE INACCURATE INFORMATION WAS RELIED UPON IN THE GUIDELINES SCORING AND HIS DEFENSE COUNSEL'S FAILURE TO OBJECT CONSTITUTES INEFFECTIVE ASSISTANCE.

V.     APPELLANT EARL ANTHONY JOHNSON IS ENTITLED TO RESENTENCING BECAUSE THE SENTENCING JUDGE

> INCREASED THE STATUTORY SENTENCING GUIDELINE
> RANGE IN HIS CASE BASED ON FACTS WHICH WERE NOT
> PROVEN TO A JURY BEYOND A REASONABLE DOUBT IN
> VIOLATION OF BLAKELY V. WASHINGTON.

The court of appeals found no merit to petitioner's claim, and affirmed his conviction and sentence.  *See People v. Johnson*, No. 252508,252510, 2005 WL 711763 (Mich. Ct. App. Mar. 29, 2005) (per curiam).

4.   Petitioner, proceeding *pro se*, sought leave to appeal in the Michigan Supreme Court, raising the same claims raised in the Michigan Court of Appeals.  On January 27, 2006, the Michigan Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Johnson*, 474 Mich. 1019, 708 N.W.2d 389 (2005).

5.   Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on December 28, 2006.  As grounds for the writ of habeas corpus, he raises the following claims:

> I.      THERE WAS INSUFFICIENT EVIDENCE AS A MATTER OF
> LAW TO ESTABLISH PETITIONER EARL ANTHONY
> JOHNSON'S CONVICTION FOR KIDNAPPING AS REQUIRED
> BY THE DUE PROCESS CLAUSES IN THE FEDERAL AND
> STATE CONSTITUTIONS.
>
> II.     THE PROSECUTOR'S MISCONDUCT VIOLATED PETITIONER
> EARL ANTHONY JOHNSON'S RIGHT TO DUE PROCESS OF
> LAW AND A FAIR TRIAL AS GUARANTEED BY BOTH THE
> FEDERAL AND STATE CONSTITUTIONS.
>
> III.    PETITIONER EARL JOHNSON'S RIGHT TO EQUAL
> PROTECTION OF THE LAW AND HIS RIGHT TO A FAIR JURY
> WERE VIOLATED WHERE THE PROSECUTOR PURPOSELY
> EXCLUDED AFRICAN-AMERICANS FROM THE JURY.
>
> IV.     PETITIONER EARL JOHNSON IS ENTITLED TO
> RESENTENCING WHERE THE STATUTORY SENTENCING

3

GUIDELINES WERE MISSCORED AND THE IMPOSED SENTENCE IS A DEPARTURE FROM THE STATUTORY SENTENCING GUIDELINES ABSENT COMPLIANCE WITH THE DEPARTURE REQUIREMENTS AND IN VIOLATION OF DUE PROCESS OF LAW WHERE INACCURATE INFORMATION WAS RELIED UPON IN THE GUIDELINE SCORING AND HIS DEFENSE COUNSEL'S FAILURE TO OBJECT CONSTITUTES INEFFECTIVE ASSISTANCE.

V.     PETITIONER EARL JOHNSON IS ENTITLED TO RESENTENCING BECAUSE THE SENTENCING JUDGE INCREASED THE STATUTORY SENTENCING GUIDELINE RANGE IN HIS CASE BASED ON FACTS WHICH WERE NOT PROVEN TO A JURY BEYOND A REASONABLY DOUBT IN VIOLATION OF BLAKELY V. WASHINGTON.

6.     On January 11, 2007, because the petitioner did not enclose the filing fee or an application *in forma pauperis*, the Court ordered petitioner to pay the $5.00 filing fee or to apply for leave to proceed *in forma pauperis*.   On June 13, 2007, the Court dismissed the habeas petition without prejudice because petitioner had not complied with the Court's order.   However, on July 12, 2007 the Court reinstated the petitioner's habeas petition after receiving the filing fee and his request for reinstatement of his habeas petition.

7.     Respondent filed his answer on January 31, 2008.   He contends that petitioner's claims are without merit.

B. *Factual Background Underlying Petitioner's Conviction*

The facts underlying petitioner's conviction were summarized by the Michigan Court of Appeals:

During the afternoon of March 17, 2003, Jeffrey Norman received a phone call from defendant Lewis, an acquaintance, asking for marijuana. Norman and defendant Lewis had a history of calling one another if they needed marijuana and had occasionally gotten together socially.  On the afternoon in question, Norman and his girlfriend, Melissa Kessler, did not

4

have any marijuana but were already planning to meet Brandon McTurner who they believed would supply them with marijuana.   Norman told defendant Lewis that he could come along and agreed to pick him up on their way to acquire the marijuana.  Kessler drove Norman in her vehicle to meet defendant Lewis at the Key Manor Apartments in Romulus.  On arriving at the apartments, defendant Lewis got into the back seat of the car and asked if his cousin, defendant Johnson, could come as well. Norman and Kessler agreed, and defendant Johnson also entered the vehicle.

As Kessler began pulling out of the complex parking lot, each defendant brandished a gun, pointed it at Norman's neck, and told him to empty his pockets.  Initially, Norman thought they were joking and asked if it was some sort of game.  Defendants responded that they were serious and they would kill him if he did not comply.  Norman turned over his cell phone and his cash.  Defendants then demanded Kessler's cash, which she immediately turned over to defendants.  Defendants were not pleased with their cache, accused them of hiding something, and then told Norman to call "his boy" McTurner.  With the guns still at his neck Norman feared for his life and called McTurner to set up a meeting to purchase marijuana. McTurner agreed to bring four ounces of marijuana and planned to meet at Scores Lanes in Taylor, which was the location selected by defendants. Defendants then ordered Norman to call McTurner again and ask him how much marijuana he had available.  McTurner said he had about eight ounces and agreed to bring it.

En route to the bowling alley, Kessler stopped at a gas station because they were running low on fuel.  Defendant Lewis went in and paid and Kessler pumped the gas into her car.  They returned to the road and reached Scores Lanes.  Kessler parked in the middle of the parking lot. Defendants told Norman to get out of the car and told Kessler that if she left, called the police, or made a scene, they would kill Norman. Defendants tucked their guns into their pants and walked with Norman into the bowling alley.

McTurner arrived and parked next to Kessler's car after defendants and Norman were inside the bowling alley.  McTurner asked where Norman was through his window and Kessler said he was inside the bowling alley.  Defendants went outside planning to take McTurner's drugs and money.  However, they just walked up to him and asked him for a cigarette which he provided.  Defendants then reentered the bowling alley and told Norman to call McTurner and tell him to get into Kessler's car. Norman complied and called McTurner directing him to wait for him in Kessler's car because he was using the restroom.  McTurner got out of his car and got into Kessler's car.

Defendants then jumped into the backseat of the car, pulled out their guns, pointed them at McTurner and told him to empty his pockets. McTurner relinquished two cell phones.  Defendants then asked where his

5

car was and for the keys.  McTurner gestured toward his car and handed over his keys.  McTurner tried to get out of the car, but the passenger door was broken and could not be opened normally from the inside.  McTurner tried to fight with the door but could not open it and defendants told him to cooperate or they would kill him.  Defendant Johnson exited Kessler's car, got into McTurner's vehicle, and began to drive to the area behind the bowling alley.  Still in Kessler's car, defendant Lewis kept the gun pointed at McTurner's neck and told Kessler to follow defendant Johnson.  Kessler followed defendant Johnson behind the bowling alley and parked.

When they parked McTurner tried again to get out of the car. Defendant Lewis had the gun pointed directly at the back of his lower neck and pulled the trigger three times, but the gun did not fire.  McTurner eventually got the window of the passenger door down and was able to open the door from the outside and get out the vehicle.  Defendant Lewis grabbed a hold of McTurner, and McTurner's shirt ripped as he eventually freed himself and ran away.  Defendant Lewis got out the car and yelled that McTurner got away to defendant Johnson who was searching the trunk o[f] McTurner's car.  Defendant Lewis then got into the front seat of Kessler's car and defendant Johnson got into the back seat.  Meanwhile, McTurner ran into the bowling alley and asked the manager to call 911.

Defendants told Kessler to drive so she did.  With the guns on their laps, defendants gave her direction where to go and what speed to travel, telling her they would kill her and her daughter if she did not comply. Kessler was hysterical and they told her to stop crying.  About five or six police cars passed them on the road going the opposite direction toward the bowling alley.  Defendants told her to pull into the parking lot of a CVS and she did.  Defendant Lewis grabbed at rings Kessler was wearing, but they were tight and would not come off.  Warning her not say anything, they got out of the car.  Kessler drove away in the direction of the bowling alley to find the police.  When Kessler reached the bowling alley she talked to the police and told them where she had dropped off defendants and some officers headed in that direction.  While Kessler spoke to the police, Norman walked out of the bowling alley, saw Kessler crying, and walked over to her and also talked to the police.

Defendants entered CVS and asked to call a taxi.  Tricia Morton, and another CVS employee, Kevin Manetta, thought defendants were acting suspicious and Morton called the police.  The police arrived and apprehended both defendants.  Police recovered two guns, two cell phones, a pager, money, and suspected marijuana.

*Johnson*, 2005 WL 711762, at *1-2, slip op. at 2-3.

C.  *Standard of Review*

6

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).  Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."  *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'"  *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694.  "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case."  *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529

7

U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's

resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.  *Insufficient Evidence Claim*

Petitioner contends that the prosecution presented insufficient evidence as a matter of law to establish his conviction for kidnapping as required by the due process clauses in the federal and state constitutions.  The Court should conclude petitioner is not entitled to habeas relief on this claim.

1.  *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In Re Winship*, 397 U.S. 358, 364 (1970).  Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).   The reviewing court must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution.  *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992).  In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence.  *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version of § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision.  Thus, the

question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable.   *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub. nom.  Gomez v. DeTalla*, 522 U.S. 801 (1998); *Restrepo v. DiPaola*, 1 F. Supp. 2d 102, 106 (D. Mass. 1998).

### 2.  *Elements of Kidnapping*

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, see *Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case."  *Patterson v. New York*, 432 U.S. 197, 211 n. 12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n. 16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2nd Cir. 1999).  Accordingly, it is necessary to examine the elements of kidnapping under Michigan law.

Michigan law provides:

> (1) [a] person commits the crime of kidnapping if he or she knowingly restrains another person with the intent to do 1 or more of the following:
>> (a) Hold that person for ransom or reward.
>> (b) Use that person as a shield or hostage.
>> (c) Engage in criminal sexual penetration or criminal sexual contact with that person.
>> (d) Take that person outside of the state.
>> (e) Hold that person in involuntary servitude.
>
> (2) As used in this section, "restrain" means to restrict a person's movements or to confine the person so as to interfere with that person's liberty without that person's consent or without legal authority.   The restraint does not have to exist for any particular length of time and may be related or incidental to the commission of other criminal acts.

MICH. COMP. LAWS § 750.349.  The Michigan Supreme Court has consistently held that

10

kidnapping requires that the prosecutor prove four elements beyond a reasonable doubt: (1) forcible confinement of the victim within the state; (2) done willfully, maliciously, and without lawful authority; (3) against the will of the person confined or imprisoned; and (4) an asportation of the victim which is not merely incidental to an underlying crime, unless the underlying crime involves murder, extortion, or taking a hostage. *See People v. Wesley*, 421 Mich. 375, 388, 365 N.W.2d 692 (1984); *Johnson*, 2005 WL 711762, at *4, slip op. at 5. Further, under Michigan law, kidnapping does not require a showing of specific intent. *See Johnson*, 2005 WL 711762, at *4, slip op. at 5.

3. *Analysis*

Petitioner argues that the prosecution presented insufficient evidence to "establish the elements of the charged kidnapping, specifically, that [he] possessed the specific intent to extort money or valuables for the release of the victims at the time of the confinement." (Br. in Supp. of Pet., at 2). The Michigan Court of Appeals rejected petitioner's claim, reasoning:

> [A] challenge to the sufficiency of the evidence is reviewed de novo and in a light most favorable to the prosecution to determine whether any rational factfinder could have found that the essential elements of the crime were proved beyond a reasonable doubt . . . Defendant Johnson [argues] that he did not have the requisite "specific intent" for a jury to convict him of kidnapping. We note, again, that forcible confinement kidnapping does not require a showing of specific intent . . . . Our review of the record reveals that sufficient evidence existed to establish defendant Johnson acted willfully, maliciously, without lawful authority, and with the necessary general intent.
> The record evidence at trial showed that upon entering Kessler's car, defendant Johnson pulled out a gun, pointed it at Norman and stole both Kessler's and Norman's cash and belongings. Defendant Johnson then forcibly directed them to drive him to Scores Lanes so he could also victimize McTurner, all while keeping his gun on Norman. Defendant Johnson did not allow Kessler and Norman to leave when they stopped on the way to the bowling alley to get gas. At Scores Lanes, defendant

11

> Johnson used Norman as a pawn to lure in McTurner and kept Kessler confined in her automobile against her will under the threat that he would kill her boyfriend, Norman, despite the fact that she no longer had anything of value. Defendant Johnson continued to threaten Norman and used him to stall and direct McTurner to wait in Kessler's car. Once McTurner was in the car, defendant Johnson ransacked McTurner's automobile while defendant Lewis threatened McTurner at gunpoint and confined him in the car against his will even after he had given up his belongings only until he was able to escape. Finally, after defendants obtained all the victims' cash, drugs, and other belongings, they did not let Kessler go and instead forced her to drive them to a getaway location. This was all done without any of the victims' consent. This evidence is sufficient for a reasonable juror to find that defendant Johnson acted willfully, maliciously, and without lawful authority. It also satisfied the general intent requirement for forcible confinement kidnapping for all three victims.

*Johnson*, 2005 WL 711762, at *7, slip op. at 8. The Court should conclude that this determination was reasonable, and thus that petitioner is not entitled to habeas relief.

Pursuant to *Jackson*, viewing all of the evidence in a light most favorable to the prosecution, the evidence presented at trial sufficiently established that a rational trier of fact could find beyond a reasonable doubt that petitioner was guilty of kidnapping all three of the victims. That is, petitioner, along with his co-defendant, held all three victims against their will at one or more times during the course of events on March 17, 2003. Furthermore, petitioner contends that there was insufficient evidence to establish specific intent to extort money or valuables for the release of the victims at the time of the confinement is without merit. As noted above, state courts define the applicable law, and Michigan has held that a conviction of kidnapping requires proof of no intent more specific than intent to confine or imprison another person against his will. *See People v. Jones*, 92 Mich. App. 100, 284 N.W.2d. 501 (Mich. Ct. App. 1979), *Muehlenbein v. Warren*, No 06-CV-11861 2007 WL 2773811, at * 17 (E.D. Mich. Sept.

12

20, 2007) (Steeh, J., adopting Report of Komives, M.J.).   As such, the petitioner's argument is without merit.   In short, the evidence was sufficient, if believed, to establish beyond a reasonable doubt that petitioner willfully, maliciously, and without lawful authority confined the victims.   Therefore, under the deferential standard of review applicable here, the Michigan Court of Appeals's conclusion was reasonable. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.   *Prosecutorial Misconduct Claim*

Petitioner next contends that the prosecutor committed prejudicial misconduct by improperly vouching for the witnesses' credibility.   The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.   *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned."   *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).   Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."   *Id.* (internal quotation omitted).   "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).   In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they are deliberately or accidentally placed before the jury; and the strength of the competent

13

proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

2. *Analysis*

Improper vouching occurs only either (1) "when a prosecutor supports the creditability of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the prosecutor's office behind that witness," or (2) through "comments that imply that the prosecutor has special knowledge of the facts not in front of the jury." *United State v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999); *see also*, *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001).[1] The Michigan Court of Appeals after identifying and applying the correct standard rejected the petitioner's claim reasoning:

> A prosecutor may not ask the jury to convict a defendant on the basis of the prosecutor's personal knowledge or the prestige of his office nor may the prosecutor vouch for the credibility of witnesses to the effect that he has some special knowledge concerning a witness's truthfulness. A prosecutor may, however, argue from the facts that the defendant or another witness is not worthy of belief. No error requiring reversal will be found if the prejudicial effect of the prosecutor's comments could have been cured by a timely instruction.
>
> We have reviewed the challenged remarks, and when we consider them in context and evaluate them in light of defense arguments and their relationship to the evidence presented at trial, we conclude that no error occurred. It was defense counsel's theory of the case that the victims lied to the police. The prosecution was rebutting the defense argument that Kessler, Norman, and McTurner were motivated to lie. The prosecutor's remarks were not inappropriate because the comments were no more than a response to defense counsel's theory of the case and related

---

[1] Some cases refer to only the first type of comment as "vouching" and describe the second type of comment as "bolstering." *See Francis*, 170 F.3d at 551.

> argument.  Further, a review of the challenged comments reveals that the prosecution was arguing that the facts and evidence taken as a whole demonstrated the victims were credible.  Accordingly, the prosecution did not improperly vouch for the credibility of the victims.
>
> Additionally, we note that the trial court instructed the jury that the arguments and comments of the lawyers were not evidence, thereby dispelling any prejudice.  Consequently, we find no error requiring reversal with respect to the prosecutor's comments at closing argument.

*Johnson*, 2005 WL 711762, at * 8, slip op. at 9 (citations omitted). The Court should conclude that this determination was reasonable, and thus the petitioner is not entitled to habeas relief for this claim.

At the outset, it should be noted that the prosecutor's comments were a fair response to the attacks on the prosecution's case made by defense counsel.  The defense was premised on the theory that the victims lied to the police.  As the Supreme Court has explained, an important factor in evaluating the permissibility of prosecutorial comments is whether the prosecutor's statements were "invited by or was responsive" to the defense.  *See Darden v. WainWright*, 477 U.S. 168, 182 (1986).  More importantly, when viewed in context it is clear that the prosecutor's comments did not express a personal belief in the witnesses' credibility (or lack thereof), or imply that the prosecutor had special knowledge of facts not before the jury.  The statements isolated by petitioner occurred in the context of a broad discussion rebutting the defense argument that the victims were motivated to lie.  *See* Trial Tr., Day Six, at 129-150. Thus, the prosecutor did not express a personal belief in the witnesses' veracity or suggest that facts found outside the record supported their testimony, but merely argued to the jury that the evidence and common sense should lead it to conclude that the prosecution's witnesses were credible.  The prosecutor's comments were merely a

15

fair characterization of the evidence presented to the jury based on her summation of that evidence.  As such, they did not constitute impermissible vouching for the credibility of the witnesses.   *See*, e.g., *Nichols v. Scott*, 69 F.3d 1255, 1283 (5th Cir. 1995) (comment "is permissible to the extent that it draws a conclusion based solely on the evidence presented." (internal quotation omitted); *United States v. Grey Bear*, 883 F.2d 1382, 1392 (8th Cir. 1989); *Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir. 1985) (prosecutor may argue permissible inferences from the evidence).

Further, "it is well established that juries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict.  While common sense is no substitute for evidence, common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence." *United States v. Durham*, 211 F.3d 437, 441 (7th Cir. 2000) (internal quotation omitted).  Thus, the prosecutor was permitted to urge the jury to use its common sense in evaluating the credibility of the witnesses' testimony.  *See United States v. Catano*, 65 F.3d 219, 228 (1st Cir. 1995); *United States ex rel. Hamilton v, Ellingsworh*, 629 F. Supp. 356, 366 (D. Del. 1988).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on these prosecutorial misconduct claims.

F.   *Equal Protection Claim*

Petitioner argues that his federal constitutional rights to equal protection under the law and to a fair jury were violated because the prosecutor purposely excluded African Americans from the jury.  This Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.  *Clearly Established Law*

16

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Court held that "[a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried, the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race[.]" *Batson*, 476 U.S. at 89 (citation and internal quotation omitted).[2]   In evaluating *Batson* claims, a court must follow a three-step process:

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race.  Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Hernandez v. New York*, 500 U.S. 352, 358-59 (1991) (plurality opinion) (citations omitted) (citing *Batson*, 476 U.S. at 96-98); *see also*, *Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003).  With respect to the first prong, a *prima facie* showing requires a defendant to show that the prosecutor exercised a peremptory challenge against a member of a cognizable racial group, and that the relevant circumstances raise an inference that the prosecutor removed the potential juror because of his or her race. *See Batson*, 476 U.S. at 96-97.  Further, "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."  *Johnson v. California*, 545 U.S. 162, 170 (2005).

---

[2] *Batson* has been extended to prohibit gender-based peremptory challenges, *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994). Further, *Batson* has been extended to prohibit impermissible race or gender-based challenges by criminal defendants, *Georgia v. McCollum*, 505 U.S. 42 (1992) and by parties in civil cases, *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991).

Further, as pre-AEDPA decisions have noted, "[t]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact that is entitled to 'great deference on appeal.'"  *Kelly v. Withrow*, 25 F.3d 363, 367 (6th Cir. 1994) (quoting *Hernandez*, 500 U.S. at 364).  Thus, under the AEDPA, a state court's determination that a prosecutor's use of peremptory challenges was not motivated by discrimination will be upheld, and a petitioner will not be entitled to habeas relief, unless it can be said that the state court's decision amounted to an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see Miller-El*, 537 U.S. at 348.

2. *Analysis*

Here, the Michigan Court of Appeals correctly identified *Batson* and the legal standards governing petitioner's claim.  Applying those standards, the court concluded that petitioner's *Batson* claim was without merit:

> In the trial court below, after defendant Johnson objected to the prosecutor's use of peremptory challenges the trial court called upon the prosecutor to provide race-neutral reasons for the use of the peremptory challenges.  The trial court found the prosecutor's reasons to be race-neutral.  Bearing in mind that as the Supreme Court stated, "trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination," the only question before us is whether the prosecutor's explanation is sufficient.
>
> On appeal, defendant Johnson specifically argues that the prosecutor attempted to systematically remove African American jurors from the jury panel when she used seven of her nine peremptory challenges to excuse African American jurors.  Our review of the record reveals that the prosecutor provided race-neutral reasons for utilizing her peremptory challenges in the manner she did.  The prosecutor offered the following reasons: two jurors had been to court with family members that had been charged with gun crimes, two more were elderly, one seemed to have problems hearing and appeared to be sleeping at one point, and the other indicated a reluctance to serve on the jury to the officer-in-charge

> before trial; one was a social worker and it was the prosecutor's practice to exclude social workers; another had previously served on a murder trial in the same court; and finally, one juror knew family members of one of defendants from church.
>
> After reviewing the record, and giving great deference to the trial court's findings, we conclude that the prosecutor provided a race-neutral explanation for all the peremptory challenges used that was related to the circumstances at bar. Accordingly, defendant Johnson's claim that his rights were violated by the prosecution's exercise of peremptory challenges to dismiss African American jurors is without merit.

*Johnson*, 2005 WL 711762, at * 9, slip op. at 10 (citations omitted). The Court should conclude that this is a reasonable application of *Batson*, and thus that petitioner is not entitled to habeas relief on this claim.

Petitioner contends that the prosecution did not meet its burden under *Batson* because "the prosecutor provided no single factor, or set of factors, which would justify excluding the African-American from the jury. . . [and] [n]one of the excused of the excused African-American jurors indicated they could not be a fair and impartial" (Br. in Supp. of Pet., at 10). However, the prosecutor must only give a "clear and reasonably specific explanation . . . for exercising the challenge," *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005) (internal citations omitted), and there is no demand that the explanation is persuasive or even plausible. *See Purket v. Elem*, 514 U.S. 765, 768 (1995).

Here, the prosecutor provided clear and reasonably specific explanations for exercising the challenges. The prosecutor explained on the record that she had race neutral reasons for excluding the seven African Americans.

First, the prosecutor explained that Juror Johnson was excused because her brother had been accused of a felonious assault and felony firearm. *See* Trial Tr., Day Two, at 50. The case went to trial in the same court and Juror Johnson had attended

the court proceedings, and the prosecutor did not want her on the jury with gun allegations involved.  *See* Trial Tr., Day Two, at 50.  The prosecutor stated: "The fact that the prosecutor's office charged her brother and that she's been through the system with her brother here in this building. So that's my reason for Ms. Johnson."  Trial Tr., Day Two, at 50.  This explanation is clear, reasonable, and race-neutral.

Second, the prosecutor explained that Juror Irving was excused because her son had been convicted of carrying a concealed weapon.  *See* Trial Tr., Day Two, at 50. The prosecutor stated: "[Irving] said her son had been charged with carrying a concealed weapon, that the case made its way through the 36th District Court that she herself had gone with him to court.  This is a weapons type offense in that it's alleged the defendants had guns."  Further, the prosecutor explained that Juror Irving's nephew had been convicted of armed robbery, and this defendant was also charged with armed robbery.  *See* Trial Tr., Day Two, at 51.  This explanation for excusing Juror Irving is clear, reasonable, and race-neutral.

Third, the prosecutor excused Juror Reed "because he indicated when the [prosecutor] was voir diring on whether or not people that . . . someone could lie but still tell the truth about the rest of the circumstances, he indicated, well, that he was a good Christian and he wouldn't lie.  Just flat out wouldn't lie."  Trial Tr., Day Two, at 51.  The prosecutor also explained that Juror Reed was elderly and seemed to at one point not hear the prosecutor.  *See* Trial Tr., Day Two, at 51.  Furthermore, the prosecutor observed Juror Reed with his eyes closed during the voir dire.  *See* Trial Tr., Day Two, at 51.  These reasons for excusing Juror Reed are clear, reasonable, and race-neutral.

Fourth, the prosecutor excused Juror Beasley because "he approached the officer

20

in charge and asked how he could get off the jury. He didn't want to serve. So, for that reason, because of his approaching the officer in charge and indicating his reluctance on even serving on a jury, [the prosecutor] asked to have him excluded." *See* Trial Tr., Day Two, at 52. This explanation for excusing Juror Beasley is clear, reasonable, and race-neutral.

Fifth, the prosecutor excused Juror Allen because Juror Allen was a social worker. *See* Trial Tr., Day Two, at 52. The prosecutor explained that it is her practice to excuse social workers because "social workers are not necessarily good jurors for prosecutors, no matter what their race." Trial Tr., Day Two, at 52. This too is a clear, reasonable, and race-neutral explanation for excusing Juror Allen.

Sixth, the prosecutor excused Juror Steel because she had been a juror on a murder case previously. *See* Trial Tr., Day Two, at 52. The prosecutor explained "because of that prior jury service in a murder case in this building, I didn't feel comfortable keeping her on a jury on this type of case." Trial Tr., Day Two, at 52. This explanation for excusing Juror Steel is clear, reasonable, and race-neutral.

Seventh, the prosecutor excused Juror Miller because he knew one of the defendant's family members from church and had worked with one of the defendant's uncles. Trial Tr., Day Two, at 53. Again, this explanation for excusing Juror Miller is clear, reasonable, and race-neutral.

The explanations for excluding all seven jurors were race-neutral; therefore, the petitioner failed to meet his burden regarding racial motivation on the part of the prosecutor with respect to her peremptory challenges to remove seven African Americans from the final jury panel. In short, apart from the fact of the exercise of the

peremptory challenges, petitioner has not "provided any other 'relevant circumstances' to inform [the court] whether the prosecution used the peremptory challenges in a discriminatory manner," and the Michigan Court of Appeals's denial of his Batson claim "is therefore not contrary to or an unreasonable application of clearly established Supreme Court precedent."  *Anderson v. Couran*, 227 F.3d. 893, 902 (7th Cir. 2000). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.  *Sentencing Claims*

    1.  *Guidelines Scoring Claim*

Petitioner next contends that he is entitled to re-sentencing because of scoring errors or because the trial judge relied upon "inaccurate information" in determining petitioner's final sentence.  This claim is not cognizable on habeas review.

A habeas petitioner's claim that the trial court violated state law when sentencing him is not cognizable in habeas corpus proceedings. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987). Federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Department of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). Petitioner's claim that the court improperly scored the guidelines range raises an issue of state law that is not cognizable on habeas review. *See Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (Gadola, J.) (claim that sentencing court departed from Michigan sentencing guidelines presents an issue of state law only and is, thus, not cognizable in federal habeas review); *Welch v. Burke*, 49

22

F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.) (same); *see also, Branan*, 851
F.2d at 1508 (claim that court misapplied state sentencing guidelines not cognizable on
habeas review).  Accordingly, the Court should conclude that petitioner is not entitled to
habeas relief on this claim.

    2.  *Apprendi Claim*

    Petitioner contends that his sentence violated his Sixth Amendment right to a jury
trial because it was based on facts not found beyond a reasonable doubt by a jury.  The
Court should conclude that this claim is without merit.

    Petitioner's claim is based on the Supreme Court's *Apprendi* line of cases.  In
*Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Court held that "[o]ther than the fact
of a prior conviction, any fact that increases the penalty for a crime beyond the
prescribed statutory maximum must be submitted to a jury, and proved beyond a
reasonable doubt."  *Id.* at 490.  In *Blakely*, the Court considered the applicability of
*Apprendi* to a state sentencing guidelines scheme similar to the United States
Sentencing Guidelines.  The state in that case argued that guidelines findings were not
prohibited by *Apprendi* because *Apprendi* prohibited only factual findings at sentencing
which increased the statutory maximum penalty to which the defendant was exposed.
The Court in *Blakely* rejected this argument and struck down the state guidelines
scheme, explaining that:

> the "statutory maximum" for *Apprendi* purposes is the maximum sentence
> a judge may impose *solely on the basis of the facts reflected in the jury
> verdict or admitted by the defendant.*  In other words, the relevant
> "statutory maximum" is not the maximum sentence a judge may impose
> after finding additional facts, but the maximum he may impose *without* any
> additional findings. When a judge inflicts punishment that the jury's verdict
> alone does not allow, the jury has not found all the facts "which the law

makes essential to the punishment," and the judge exceeds his proper authority.

*Blakely*, 542 U.S. at 303-04 (citations omitted) (emphasis in original).

Finally, in *United States v. Booker*, 543 U.S. 220 (2005), the Court took the step logically suggested by *Blakely*, concluding that the United States Sentencing Guidelines are unconstitutional under *Apprendi* because they allow federal judges to impose sentences based on facts not found by a jury beyond a reasonable doubt. Two separate majorities formed the Court's decision. Justice Stevens delivered the opinion of the Court on the substantive question of whether the Guidelines are unconstitutional under *Apprendi*. Noting that there was no difference of constitutional significance between the Guidelines and the state guideline system at issue in *Blakely*, *see Booker*, 543 U.S. at 233, and rejecting the government's attempts to distinguish the two, *see id.* at 237-43, the merits majority concluded that the Guidelines violate the Sixth Amendment as interpreted in *Apprendi*. A separate majority joined an opinion authored by Justice Breyer, which contained the Court's decision on the remedial issue. The remedial majority concluded that the appropriate remedy for the constitutional violation was not to strike the Guidelines in their entirety, but to excise two statutory provisions which make the Guidelines mandatory. *See id.* at 245. Thus, under *Booker* the Guidelines remain advisory, and a federal district judge must consult the Guidelines before imposing sentence, but the judge is not bound to follow the Guidelines.

Petitioner contends that, because the trial court made the necessary findings on the sentencing guidelines, his sentence violates *Blakely*. The Court should conclude that petitioner is not entitled to habeas relief on this claim. Michigan law provides for an

24

indeterminate sentencing scheme, unlike the determinate sentencing schemes at issue in *Blakely* and *Booker*.  Under Michigan law the defendant is given a sentence with a minimum and a maximum sentence.  The maximum sentence is not determined by the trial judge but is set by law.  *See People v. Drohan,* 475 Mich. 140, 160-61, 715 N.W.2d 778, 789-90 (2006); *People v. Claypool,* 470 Mich. 715, 730 n.14, 684 N.W.2d 278, 286 n.14 (2004); MICH. COMP. LAWS § 769.8.  "[M]ichigan's sentencing guidelines, unlike the Washington guidelines at issue in *Blakely*, create a range within which the trial court must set the minimum sentence." *Drohan,* 475 Mich. at 161, 715 N.W.2d at 790.  Under Michigan law, only the minimum sentence must presumptively be set within the appropriate sentencing guidelines range.  *See People v. Babcock,* 469 Mich. 247, 255 n.7, 666 N.W.2d 231, 236 n.7 (2003) (discussing MICH. COMP. LAWS § 769.34(2)).  Under Michigan law, the trial judge sets the minimum sentence, but can never exceed the maximum sentence. *See Claypool,* 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14.

*Blakely* is inapplicable here because *Blakely* is concerned only with the *maximum* penalty which is authorized by a jury's findings or a defendant's plea: if some additional factor increases the defendant's penalty beyond that which could be imposed solely on the basis of the jury's findings or the defendant's plea, *Blakely* requires that those facts be found by a jury beyond a reasonable doubt (or be themselves pleaded to by a defendant).  As explained above, unlike the guidelines scheme at issue in *Blakely*, the Michigan sentence guidelines help determine only the minimum portion of a defendant's indeterminate sentence.  The maximum is, in every case, the statutory maximum authorized by law.  *See Claypool*, 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14; MICH. COMP. LAWS § 769.8. Petitioner's conviction, therefore, contained all of the

factual findings necessary to impose the statutory maximum on that charge. *See Drohan*, 475 Mich. at 162, 715 N.W.2d at 790 ("Thus, the trial court's power to impose a sentence is always derived from the jury's verdict, because the 'maximum-minimum' sentence will always fall within the range authorized by the jury's verdict.").

This being the case, petitioner's sentence did not violate *Blakely* even though the trial court made additional factual findings in imposing the minimum term of petitioner's imprisonment. The Supreme Court has repeatedly made clear that the *Apprendi* rule is concerned only with the maximum sentence which is authorized by a jury's verdict or a defendant's plea. As the Supreme Court explained in *Harris v. United States*, 536 U.S. 545 (2002):

> *Apprendi* said that any fact extending the defendant's sentence beyond the maximum authorized by the jury's verdict would have been considered an element of an aggravated crime–and thus the domain of the jury–by those who framed the Bill of Rights. The same cannot be said of a fact increasing the mandatory minimum (but not extending the sentence beyond the statutory maximum), for the jury's verdict authorized the judge to impose the minimum with or without the finding.

*Harris*, 536 U.S. at 557. This distinction is important because the only issue under the Sixth Amendment is whether the judge is impinging on the role of the jury. For this reason, the Court explicitly excepted indeterminate sentencing schemes such as Michigan's from its holding in *Blakely*. Rejecting an argument raised by Justice O'Connor in dissent, the Court explained:

> Justice O'Connor argues that, because determinate sentencing schemes involving judicial factfinding entail less judicial discretion than indeterminate schemes, the constitutionality of the latter implies the constitutionality of the former. This argument is flawed on a number of levels. First, the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of

the jury.  Indeterminate sentencing does not do so.  It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty.  Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion.  But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence– and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned.

*Blakely*, 542 U.S. at 309 (citation omitted).

Under this reasoning, it is clear that Michigan's indeterminate sentencing guideline scheme, under which the maximum is established by statute and only the minimum term is based on judicial factfinding, does not violate the Sixth Amendment. *See Bellamy v. Curtin*, No. 1:06-CV-599, 2007 WL 527988, at *4 (W.D. Mich. Feb. 14, 2007); *Mays v. Trombley*, No. 2:06-CV-14043, 2006 WL 3104656, at *3 (E.D. Mich. Oct. 31, 2006) (Hood, J.); *Worley v. Palmer*, No. 2:06-CV-13467, 2006 WL 2347615, at *2 (E.D. Mich. Aug. 11, 2006) (Cohn, J.); *Toothman v. Davis*, No. 05-CV-74561, 2006 WL 2190515, at *2 (E.D. Mich. Aug. 1, 2006) (Edmunds, J.); *Drohan,* 475 Mich. at 164, 715 N.W.2d at 791-92; *Claypool*, 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14.  As such, this Court should conclude that this claim in without merit.

H.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.   <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and

27

Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than ten days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.


                                        s/Paul J. Komives
                                        PAUL J. KOMIVES
                                        UNITED STATES MAGISTRATE JUDGE

Dated:4/14/09

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record   by electronic means or U.S. Mail on April 14, 2009.

s/Eddrey Butts
Case Manager